UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

BOULAY AUTO GLASS, INC.,                    Case No. 10-CV-0798 (PJS/TNL)

Plaintiff,

v.                                          FINDINGS OF FACT AND
                                                     ORDER

ILLINOIS FARMERS INSURANCE
COMPANY and MID-CENTURY
INSURANCE COMPANY,

Defendants.

---

Charles J. Lloyd, Rachael J. Abrahamson, and Kristine M. Kerig,  LIVGARD &
LLOYD, PLLP, for plaintiff.

Steven R. Kluz, Emily L. Grande, and W. Teague Orgeman, STOEL RIVES, LLP, for
defendants.

Plaintiff Boulay Auto Glass, Inc. ("Boulay") repairs and replaces automobile glass.

Defendants Illinois Farmers Insurance Company and Mid-Century Insurance Company

(collectively "Farmers") insure automobile owners in Minnesota.  Boulay bills Farmers directly

for the work that it performs on behalf of Farmers's insureds, and, as is required under Minnesota

law, Farmers pays Boulay directly for that work.  Minn. Stat. § 72A.201, subd. 6(14).  Farmers

regularly pays less than what Boulay bills.  Boulay now seeks to recover these so-called "short

pays" — that is, the difference between what Boulay has billed and what Farmers has paid.

As a general matter, a claim that an insurer has failed to pay what is due under an

automobile-insurance policy must be arbitrated under Minnesota's No-Fault Automobile

Insurance Act, Minn. Stat. §§ 65B.41-65B.71.  But the right to force Farmers to pay for auto-

glass repairs — and thus the right to compel Farmers to arbitrate a short-pay claim — belongs to

the *insured* of Farmers, and not to Boulay or any other auto-glass shop.  Boulay may compel

Farmers to arbitrate a short-pay claim only if an insured of Farmers has assigned his or her claim

to Boulay.  Whether Boulay has received an assignment from a customer — and thus whether

Boulay has the right to compel Farmers to arbitrate a short-pay claim — is a question of fact on

which Boulay bears the burden of proof.

    In this case, Farmers has asserted that, with respect to 295 short-pay claims, Boulay

cannot prove that it was assigned the claim by one of its customers.[1]  The parties agree that the

295 disputed claims fall into two groups:  The first group consists of 83 claims that were

assigned by customers of Boulay to a company called Neon Claims Advantage ("NCA").[2]

Farmers argues that because these claims were not assigned to Boulay, but were instead assigned

to NCA, Boulay does not have the right to force Farmers into arbitration.  The second group

consists of 212 claims as to which Boulay cannot produce a copy of an assignment bearing the

customer's signature.  Farmers contends that, in the absence of such evidence, Boulay cannot

---

    [1]This dispute is before the Court on cross-motions for summary judgment.  Def. Mot. S.J.
[Docket No. 62]; Pl. Mot. S.J. [Docket No. 68].  All of the disputes raised by those motions —
save the dispute over whether the 295 claims were assigned to Boulay — were resolved in an
order issued by the Court on January 12, 2011.  Order Jan. 12, 2011 [Docket No. 87].

    Boulay and Farmers initially briefed and submitted evidence regarding 353 disputed
claims.  But 58 of those claims are no longer disputed.  Boulay withdrew 55 claims, and Farmers
withdrew its challenge to the following 3 claims: Roger Maltzen, Jean Meyer, and Linda Bailie.
Plaintiff's Memorandum Of Law Pursuant To This Court's June 8, 2011 Order ("Pl. Mem.") at
2-5 [Docket No. 97]; Plaintiff's Reply Memorandum Of Law Pursuant To This Court's June 8,
2011 Order ("Pl. Reply Mem.") at 2-3 [Docket No. 109]; Defendants' Briefing On Claims That
Lack A Valid Assignment ("Defs. Opp. Mem.") at 3 [Docket No. 103].

    [2]Farmers originally challenged 102 claims in this group.  Boulay withdrew 19 claims,
leaving 83 claims in dispute.  Pl. Mem. at 2-3; Pl. Reply Mem. at 2-3.

establish by a preponderance of the evidence that the assignments were made.  The Court addresses each group of disputed claims in turn.

## I.  GROUP 1: CLAIMS ASSIGNED TO NCA (83 CLAIMS)

### A.  Discussion

As to the first group of 83 claims, Boulay does not dispute that each of its customers executed an assignment that named NCA as the assignee of the customer's claim against Farmers.  But Boulay argues that, even though its customers *formally* assigned their claims to NCA, they *effectively* assigned those same claims to Boulay.  Boulay seems to make three arguments in support of its position.

Boulay's first and most developed argument is that NCA was its agent and therefore an assignment of a claim to NCA "should . . . establish a basis for Boulay to pursue the money it is owed by Farmers."  Pl. Mem. at 21.  To prevail on this theory, Boulay must establish at least two things: (1) that NCA was in fact its agent; and (2) that a principal may litigate claims that were assigned to its agent.[3]

"Agency is the fiduciary relationship that results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other to so act."  *A. Gay Jenson Farms Co. v. Cargill, Inc.*, 309 N.W.2d 285, 290 (Minn. 1981); *see also Tonka Corp. v. Comm'r of Taxation*, 169 N.W.2d 589, 593 (Minn. 1969).

---

[3]Even if Boulay could establish both of these propositions, Boulay would still not be able to compel Farmers to arbitrate *all* of the disputed claims in this group.  Boulay alleges that it terminated its relationship with NCA within six months.  Boulay Third Decl. at ¶ 8 [Docket No. 99].  NCA could not have acted as Boulay's agent after that time.  Yet many of the disputed claims in this group — claims that were assigned to NCA — involve repairs made *after* Boulay terminated its relationship with NCA.

"Whether the [agency] relationship exists is a question of fact, and the party alleging the existence of the agency has the burden of proof." *White v. Boucher*, 322 N.W.2d 560, 566 (Minn. 1982) (internal citation omitted).

According to Boulay, it entered into a business relationship with NCA (a collection agency) in April 2005. Boulay Third Decl. at ¶ 2; Tumblin Third Decl. Ex. D at 2 [Docket No. 107-4]. At that time, Boulay amended its standard work order (which included an assignment provision) to name NCA as the assignee of the customer's claim against his or her insurer. Boulay Third Decl. at ¶ 3. NCA was supposed to collect the amounts due from the insurers and forward those amounts to Boulay, minus a servicing fee. *Id.* Boulay has not introduced its contract with NCA or any other information about the precise legal nature of their relationship.

The arrangement described by Boulay could indeed have been a principal-agent relationship (as Boulay argues), but it could just as easily have been a relationship between Boulay and an independent contractor, who was not an agent. And the record contains evidence suggesting that NCA was such an independent contractor. Boulay admits that it terminated its relationship with NCA in part because NCA refused to follow Boulay's instructions. *Id.* at ¶ 4. Boulay's admission implies that two critical ingredients of a principal-agent relationship may have been missing: (1) the principal's control over the acts of its agent, and (2) the agent's consent to be controlled by the principal.

Boulay argues that the fact that its arrangement with NCA failed — and the fact that it could not audit NCA's records or that it disapproved of NCA's collection tactics, Boulay Third Decl. at ¶ 4 — does not necessarily mean that NCA was not its agent. Boulay may be right, but

the fact remains that the record contains almost no evidence that Boulay had the right to control

NCA or that NCA consented to be controlled by Boulay.  Based on the evidence in the record,

the inference that NCA was an independent contractor, who was not an agent, is at least as strong

as the inference that NCA was Boulay's agent.

Boulay further argues that Farmers implicitly recognized that NCA was Boulay's agent.

Specifically, Boulay contends that it informed Safelite Solutions LLC ("Safelite") — a third-

party administrator that processed claims on behalf of Farmers — that Boulay had ended its

relationship with NCA, yet Safelite continued to issue payments to Boulay, even in situations in

which the customers had executed assignments naming NCA as the assignee.  Boulay Third

Decl. at ¶¶ 5-6; Pl. Mem. at 19.  But, as a legal matter, this Court has already ruled that partial

payments by Farmers do not constitute a waiver of Farmers's right to contest whether its insureds

assigned their claims to Boulay.  Order Jan. 12, 2011 at ¶ 5.  And, as a factual matter, Farmers's

payments to Boulay provide only weak evidence that Farmers had determined that NCA was the

agent of Boulay.  As the Court explains below, Farmers may very well have paid Boulay because

Boulay presented Safelite with invoices in which Boulay represented that, back in its files, it had

signed authorizations from the customers directing Farmers to make direct payment to Boulay.

In short, Boulay has failed to prove that NCA was its agent with respect to the 83 disputed

claims.

Even if Boulay could establish agency, Boulay could still not force Farmers to arbitrate

any of the 83 claims that were assigned to NCA.  Boulay has not cited — and the Court has not

found — any authority that supports Boulay's theory that a principal has a right to litigate a claim

that was assigned to one of its agents.  The absence of authority supporting Boulay's position is

not surprising.  "Agency does not merge a principal's personality into that of the agent, nor is an

agent, as an autonomous person or organization with distinct legal personality, merged into the

principal."  Restatement (Third) Agency § 1.01, cmt. c (2006).

Boulay's second argument is that the Court should not penalize it for having entered into

a business relationship with an "unscrupulous" collection agency.  Pl. Reply Mem. at 1.  But the

issue before the Court is not whether Boulay should be punished; the issue before the Court is

whether the 83 claims were assigned to Boulay.  Like any party who appears before this Court,

Boulay must live with the consequences of its decisions.  It decided to enter a relationship with

NCA, and it decided to ask its customers to assign their claims to NCA.  If Boulay believes that it

has been damaged by the "unscrupulous" conduct of NCA, then it should sue NCA.

Boulay's final argument is that, although its customers signed documents that assigned

their claims to NCA, the customers subjectively intended to assign their claims to Boulay.  Pl.

Mem. at 21 ("It is Boulay who was to be paid in the transaction, regardless of who may have

collected debts for a short time.").  In support of this argument, Boulay submitted a number of

declarations from customers stating that they intended to assign their claims to Boulay.  Lloyd

Second Decl. Ex. 7 [Docket No. 98-7]; Lloyd Third Decl. Ex. 9 [Docket No. 110-2].

It is difficult to know what Boulay wants the Court to do with these declarations, as

Boulay's argument appears untethered to any particular legal theory.  Under Minnesota law,

when a contract is clear on its face, the language of the contract is treated as conclusive evidence

of the parties' intent, and extrinsic evidence of the parties' intent may not be considered.  *See*

*Hruska v. Chandler Assocs., Inc.*, 372 N.W.2d 709, 713 (Minn. 1985) ("[W]hen parties reduce

their agreement to writing, parol evidence is ordinarily inadmissible to vary, contradict, or alter

the written agreement."); *Knudsen v. Transp. Leasing/Contract, Inc.*, 672 N.W.2d 221, 223 (Minn. Ct. App. 2003) ("[W]hen a contract is unambiguous, a court gives effect to the parties' intentions as expressed in the four corners of the instrument, and clear, plain, and unambiguous terms are conclusive of that intent."). The assignments are crystal clear — the customer assigned his or her claim to NCA, not Boulay — and thus the customers' declarations about what they "really" intended when they executed these assignments may not be considered.

Perhaps Boulay means to invite the Court to reform the assignments to NCA on the grounds of mutual mistake, even though Boulay does not mention the word "reformation" or discuss Minnesota law regarding the reformation of contracts. If this is Boulay's intent, the Court declines the invitation. It would be manifestly unfair to Farmers for the Court to grant relief to Boulay under a theory that Boulay did not expressly advance and that Farmers did not have the opportunity to brief or counter with evidence.

In sum, the Court holds that Boulay does not have the right to compel Farmers to arbitrate any of the 83 disputed claims in this group, because the disputed claims were assigned to NCA and not to Boulay.

### B. Findings of Fact

Consistent with the foregoing discussion, the Court makes the following findings of fact:

1.01.   Boulay signed a collection contract with NCA in April 2005. Tumblin Third Decl. Ex. D at 2; Boulay Third Decl. at ¶ 2.

1.02.   Boulay has not established that NCA was its agent. Specifically, Boulay has not established that it had the ability to control NCA or that NCA consented to be controlled by Boulay.

1.03.    To permit NCA to collect from the insurers of its customers, Boulay amended its

standard work order to have its customers authorize their insurance companies to pay NCA

directly.  Boulay Third Decl. at ¶ 3.  The amended work order also named NCA as the assignee

of the customers' claims against their insurers.  *See, e.g.*, Grande Decl. Ex. 4 at 3 [Docket

No. 104-4].  The amended work order, in relevant part, provided:

> I hereby authorize and direct my insurance company to pay this
> invoice to NCA and I assign any and all claims in connection with
> this Automobile glass installation or repair against my insurance
> company and all policy proceeds due for this installation or repair
> to NCA for distribution to the above named company.  If my
> insurer should ignore this directive to pay and of the assignment of
> the policy proceeds and issue payment to me, that I will
> immediately forward payment to NCA . . .

*Id.*

1.04.    Each of Boulay's customers in this group of 83 disputed claims signed the

amended work order, naming NCA as the assignee of his or her claim.  As a result, each of these

customers assigned his or her claim against Farmers to NCA.  None of these customers assigned

his or her claim to Boulay.  NCA never "re-assigned" any of these claims to Boulay.

1.05.    NCA was supposed to remit proceeds of the collections to Boulay minus its

servicing fee.  Boulay Third Decl. at ¶ 3.

1.06.    Boulay received some payment for each of the 83 disputed claims, Pl. Mem. at 21,

although it is unclear whether Boulay received payment from Safelite directly or whether Safelite

paid some claims to NCA, who then remitted the payments to Boulay.

1.07.    Boulay terminated its relationship with NCA within about six months, in part

because NCA was not following its instructions.  Boulay Third Decl. at ¶¶ 4, 8.  Many of the

disputed claims in this group involve repairs made after Boulay's relationship with NCA ended.

1.08.    Sixty-four of Boulay's customers signed sworn declarations stating that:

(a) Boulay repaired their damaged auto glass; (b) they remembered signing papers to facilitate

direct payment from their insurance companies to Boulay; and (c) they intended to assign their

claims for auto-glass repair to Boulay.[4]  Lloyd Second Decl. Exs. 5-7 [Docket Nos. 98-5, 98-6,

and 98-7]; Lloyd Third Decl. Exs. 8-9 [Docket Nos. 110-1, 110-2].  Except for the customers'

names, all of the declarations are identical, although a few customers wrote additional notes in

the margins.  *See, e.g.*, Lloyd Second Decl. Ex. 5 at 5.  The declarations do not provide details

about the claims such as the date of repair or the type of vehicle repaired.

1.09.    Of the 64 customers who signed declarations, 21 of them are customers whose

claims are among the 83 disputed claims in this group.[5]  Lloyd Second Decl. Ex. 7; Lloyd Third

Decl. Ex. 9.

1.10.    Boulay does not have the right to compel Farmers to arbitrate any of the 83

disputed claims in this group.

## II.  GROUP 2: CLAIMS UNSUPPORTED BY SIGNED ASSIGNMENTS (212 CLAIMS)

### A.  Discussion

Farmers has challenged 212 claims because, with respect to each claim, Boulay has been

unable to produce a copy of an assignment bearing the signature of a customer.  Farmers

---

[4]Boulay submitted signed declarations from 65 customers.  Farmers has withdrawn its challenge to one of the claims, leaving 64 declarations at issue.  Def. Opp. Mem. at 3.

[5]Three of these 21 customers are the subject of two disputed claims — one claim in the group of 83 disputed claims and the other claim in the group of 212 disputed claims.  *Compare* Lloyd Second Decl. Ex. 5 at 1, *and* Ex. 6 at 3, 7, *with* Lloyd Second Decl. Ex. 7 at 1-2, 7.

contends that, in the absence of such evidence, Boulay cannot establish that any of these claims were assigned to it.

In response, Boulay initially argues that Farmers is collaterally estopped from contesting the existence of these assignments. Boulay relies on the holding of this Court in an unrelated case involving an auto-glass shop named Alpine Glass — an auto-glass shop that is not connected in any way to Boulay. In that case, this Court held that Alpine Glass had established by a preponderance of the evidence that it had obtained assignments from its customers even though Alpine Glass could not produce signed assignments. *Alpine Glass, Inc. v. Illinois Farmers Ins. Co.*, 695 F. Supp.2d 909, 922-23 (D. Minn. 2010), *aff'd* 643 F.3d 659 (8th Cir. 2011).

Collateral estoppel requires, first and foremost, that the issue on which preclusion is sought be identical to the issue that was previously decided. *See Wellons, Inc. v. T.E. Ibberson Co.*, 869 F.2d 1166, 1168 (8th Cir. 1989); *Willems v. Comm'r of Public Safety*, 333 N.W.2d 619, 621 (Minn. 1983). Obviously, whether Alpine Glass's customers assigned their claims to Alpine Glass is not the same issue as whether Boulay's customers assigned their claims to Boulay. Collateral estoppel is clearly not applicable.

That said, the Alpine Glass litigation does illustrate that it is possible for an auto-glass shop to prove that it obtained assignments from its customers even when the auto-glass shop cannot produce copies of those assignments. An auto-glass shop can use general evidence — such as evidence that the auto-glass shop never did work for a customer without first obtaining an assignment — to establish that it was more likely than not that a particular customer executed an assignment of his or her claim against his or her insurer.

-10-

In this case, it is certainly conceivable that Boulay could prove that each of the 212 disputed claims was assigned to it, notwithstanding the fact that Boulay cannot produce signed copies of the relevant assignments. But the evidence submitted by Boulay must establish both (1) that each of the 212 customers executed *an* assignment; and (2) that the assignment executed by each of the customers named Boulay — and not NCA — as the assignee. The Court will address these issues in turn.

### 1. Did Boulay's Customers Execute Assignments?

Boulay relies on two types of evidence to establish that the 212 customers in this group executed assignments. First, Boulay submits general evidence of the parties' routine practices. Second, Boulay introduces specific evidence that certain customers executed assignments.

### a. General Evidence of Routine Practices

As a preliminary matter, the Court rejects Farmers's frivolous argument that evidence about the routine practices of Boulay and Farmers is irrelevant. If, for example, Boulay submitted undisputed evidence that never in its history did it repair the auto glass of a customer without obtaining an assignment — and undisputed evidence that Boulay repaired the auto glass of all 212 customers — then Boulay would have established by a preponderance of the evidence that it received assignments of all 212 claims. Similarly, if Boulay submitted undisputed evidence that Farmers had never in its history made a partial payment of a claim without first receiving a signed copy of an assignment — and undisputed evidence that Farmers made partial payments on all 212 claims — then Boulay likewise would have established by a preponderance of the evidence that it received assignments of all 212 claims.

Businesses commonly prove that they took an action with respect to a particular customer — such as issuing a warning or providing a receipt — by introducing evidence of their routine practices. This method of proof is so common that it is explicitly recognized in Fed. R. Evid. 406, which provides that "[e]vidence . . . of the routine practice of an organization . . . is relevant to prove that the conduct of the . . . organization on a particular occasion was in conformity with the . . . routine practice." This method of proof was also recognized by this Court in its June 3, 2011 order, which said that "[t]he parties may, of course, introduce evidence that applies to *all* of the disputed assignments — such as evidence about the routine practice of Boulay in acquiring assignments, or the routine practice of Farmers in making partial payments on claims." Order June 3, 2011 at 5 n.1 [Docket No. 93]. In short, Farmers's argument that evidence of the "routine practice" of Boulay or Farmers should be excluded as irrelevant defies common sense, is contradicted by the text of Rule 406, and is inconsistent with a previous order of this Court.

That said, the Court agrees with Farmers that the evidence regarding the parties' routine practices that has been submitted by Boulay is not sufficient to establish that all of the 212 claims were assigned to it. To begin with, Boulay's evidence that it has a routine practice of acquiring assignments from its customers is far from compelling. Boulay's customers actually fall into three groups: (1) customers who executed an assignment either before or immediately after their cars were repaired, Lloyd Second Decl. Ex. 3 at 5 [Docket No. 98-3]; (2) customers who did not immediately execute an assignment but who later returned a signed assignment by mail, *id.* at 4; and (3) customers who neither immediately executed an assignment nor returned a signed assignment by mail.

Boulay has provided no evidence as to the relative size of each category.  This omission is significant.  If Boulay had submitted credible evidence that nearly all of its customers either immediately executed assignments or returned executed assignments by mail, then the Court could find, with respect to each of the 212 disputed claims, that it is more likely than not that the claim was assigned to Boulay.  But Boulay has submitted no such evidence.  Instead, Boulay has provided vague statements that it tries hard to collect assignments and that its efforts have been "pretty effective."  *Id.* at 4-5.  Without more specific evidence, the Court cannot conclude that it is more likely than not that Boulay obtained an assignment of each of the 212 disputed claims.

Boulay's evidence regarding Farmers's routine practices is similarly flawed.  Boulay argues as follows:  Boulay received partial payment from Safelite (acting on behalf of Farmers) on most of the 212 disputed claims.  Pl. Mem. at 5.  Safelite would not have made a partial payment on a claim unless Safelite had first verified that the insured had signed a work order — a work order that authorized the auto-glass shop to make the repair and Farmers to make a direct payment to the auto-glass shop.  Lloyd Second Decl. Ex. 4 at 6 [Docket No. 98-4]; Abrahamson Decl. Ex. 3 at 3-4 [Docket No. 71-3].  A signed work order is obviously not the same thing as a signed assignment of a claim.  However, the standard work order used by Boulay — the only document that its customers signed — included a claim assignment.  Boulay Second Decl. at ¶ 3 [Docket No. 75];[6] Pl. Reply Mem. at 3.  Therefore, if Safelite made a partial payment on a claim, it must have received evidence of a signed work order, and if Safelite received evidence of a signed work

_____

[6]Boulay has submitted three declarations from John Boulay, its President.  *See* Docket Nos. 10, 75, and 99.  Docket numbers 10 and 75, however, are both entitled "Declaration of John Boulay."  For clarity, the Court refers to docket number 75 as the Second Declaration of John Boulay.

order, it necessarily received evidence of a signed claim assignment.  According to Boulay, "where Farmers made payment to Boulay," the parties' procedures "compels the conclusion that . . . Boulay submitted an assignment to Farmers."  Pl. Mem. at 10.

The Court disagrees.  It appears to be true that the standard work order used by Boulay usually (although not always[7]) included an assignment.  It may also be true (although the record is unclear) that, pursuant to Farmers's payment policy, Safelite was not supposed to pay Boulay for a repair unless Safelite first verified that a customer had signed a work order.  Abrahamson Decl. Ex. 3 at 3-4.  The problem is that, if it was indeed Farmers's policy that Safelite was not supposed to pay a claim until Safelite received a copy of a signed work order, then Safelite often violated that policy.

The fact is that Safelite did not pay claims only when it received a copy of a work order signed by a customer.  Indeed, it appears that Boulay did not even *submit* work orders to Safelite as a routine matter.  Rather, Boulay submitted *invoices*, Boulay Decl. at ¶ 4 [Docket No. 10], and, based on Boulay's assertion in those invoices that it had a "signature on file," Safelite would pay the claims.  Tumblin Second Decl. at ¶ 5 [Docket No. 79].  Boulay has not introduced any evidence regarding who prepared these invoices or what steps that person took to verify that Boulay possessed a signed copy of a work order before representing on an invoice that it had a "signature on file."  It also appears that for a time Safelite paid claims based on "loss accord"

_____

[7]Boulay's repeated insistence that a work order including a claim assignment is the "ONLY document Boulay's customers ever sign" is simply not accurate.  Pl. Reply Mem. at 3 (emphasis original).  At least one Boulay customer, Curtis Weldm, signed what appears to be a work order authorizing his insurance company to pay Boulay directly.  Tumblin Second Decl. Ex. FF [Docket No. 79-3 at 59].  This work order did not contain the claim-assignment language that Boulay insists is in every work order.  The evidence in the record nevertheless suggests that *most* of the work orders signed by Boulay's customers contained assignments.

forms that were filled out by insurance agents, *id.* at ¶ 7; these forms included neither a signature from a customer nor even a representation that a signature was on file.  For these reasons, the fact that Farmers (through Safelite) made a partial payment on a claim does not prove, by a preponderance of the evidence, that the customer signed a work order containing an assignment of that claim.

Boulay argues that it should not be punished for Safelite's failure to follow Farmers's policy of verifying actual signatures before authorizing payment.  Pl. Reply Mem. at 5 ("In light of the lofty interests at stake, if Safelite is improperly processing Farmers's claims, such as by relying on a stamp on the wrong document, the fault does not lie with Boulay and Boulay should not be penalized.").  Again, though, the Court is not meting out punishment.  The Court is simply weighing the evidence in the record and making a determination about whether, based on that evidence, it is more likely than not that each of the 212 disputed claims was assigned to Boulay. Although the question is close, the Court finds that Boulay's evidence regarding the routine practices of the parties — evidence that Boulay is forced to rely on because of its own record-keeping failures — does not establish, by a preponderance of the evidence, that the 212 disputed claims were assigned to it.

### b.  Claim-Specific Evidence (Sworn Declarations)

With respect to about a quarter of the 212 disputed claims, Boulay relies not merely on evidence regarding the routine practices of the parties, but also on evidence that is specific to each claim.  In particular, Boulay has submitted sworn declarations from 64 of its customers in which those customers aver that: (1) Boulay repaired their auto glass; (2) they remember signing papers to facilitate direct payment to Boulay; and (3) they intended to assign their insurance claims to

Boulay.  Lloyd Second Decl. Exs. 5-7; Lloyd Third Decl. Exs. 8-9.  Forty-six of these sworn declarations involve claims in this group of 212 disputed claims.  Lloyd Second Decl. Exs. 5, 6; Lloyd Third Decl. Ex. 8.  Boulay argues that the sworn declarations establish that each of these 46 customers signed a work order containing an assignment.  Pl. Mem. at 15.  Except for three declarations, the Court agrees.

Farmers urges the Court to ignore these 46 declarations because they were obtained long after the close of discovery and because Farmers thus lacked the opportunity to test the credibility of the declarants.  This argument has little merit.  Had Farmers truly wanted to depose each of the customers — something that the Court very much doubts — Farmers could have sought the Court's permission to reopen discovery.  It did not.  Farmers was also free to do the same thing that Boulay did: pick up the phone, call these customers, and talk to them.  It did not.

Farmers also objects to the declarations because they do not mention the date of repair or the type of vehicle repaired.  For the most part, this lack of specificity goes to the weight of the evidence and not to its admissibility.  For three of the declarations, though, the lack of identifying information makes the declaration essentially useless.

Three declarants — Theresa Anderson, Lynn Anderson, and Wade Deshaw — each had two repairs performed by Boulay.  But each of them signed only one declaration.  Based on those declarations — which Boulay tries to "double count," *compare e.g.*, Lloyd Second Decl. Ex. 6 at 7, *with* Lloyd Second Decl. Ex. 7 at 7 — the Court cannot tell whether the customer is referring to the first repair, the second repair, or both.  For example, Farmers challenged two invoices related to Deshaw — one dated May 17, 2005 as to which Boulay cannot produce a signed copy of a work order, and the other dated November 30, 2005 that assigns Deshaw's claim to NCA.

Deshaw's vague declaration that he signed paperwork to facilitate direct payment to Boulay could refer to the May repair, the November repair, or both. The declarations by the two Andersons are similarly ambiguous. Therefore, the Court gives little weight to these three declarations.

Without evidence that the other 43 customers who signed declarations had multiple auto-glass repairs, the Court finds that their declarations — when considered together with evidence of the routine practices of Boulay and Farmers — prove by a preponderance of the evidence that each of these 43 customers made an assignment of his or her claim.

### 2. To Whom Did The Customers Assign Their Claims?

It is not enough, however, for Boulay to prove that each of these 43 customers made *an* assignment; Boulay must also prove that each of these 43 customers assigned his or her claim to *Boulay*. Farmers argues that because physical copies of the work orders cannot be located, it is impossible for the Court to determine whether each customer assigned his or her claim to Boulay or NCA. In response to this argument, Boulay says nothing.

Boulay did not contract with NCA until April 2005, and therefore the work orders used in 2004 would have named Boulay as the assignee. For that reason, the Court finds that it is more likely than not that the 12 customers who signed declarations regarding repairs performed in 2004 assigned their claims to Boulay.

But with respect to the remaining 31 claims, the Court agrees with Farmers that Boulay has not established that the work orders named Boulay as the assignee of the customers' claims. As discussed above, Boulay entered into a relationship with NCA in April 2005 and changed its work orders so that its customers assigned their insurance claims to NCA. Boulay Third Decl. at ¶¶ 2-3; Tumblin Third Decl. Ex. D at 2. The Court does not know whether Boulay immediately

implemented the new work order or instead used the old work order until the supply ran out. Given that it had just signed a contract with NCA, though, Boulay likely started to use the new work order immediately, and thus customers who had work done after April 2005 likely would have assigned their claims to NCA.

Boulay also has not established precisely when its business relationship with NCA ended, although it alleges that the relationship lasted less than six months. Boulay Third Decl. at ¶ 8. If Boulay in fact ended its relationship with NCA within six months and made "every effort" to discard outdated work orders, *id.*, then one would expect to see evidence of a sharp decline in the number of work orders that named NCA as the assignee beginning in October 2005. But Boulay has not provided such evidence. To the contrary, 57 of the 102 claims that Farmers originally challenged because the work orders named NCA as the assignee involve repairs performed in 2006. Obviously, then, work orders identifying NCA as the assignee continued to be used long after Boulay had ended its relationship with NCA. Boulay Third Decl. at ¶ 8. Accordingly, although the Court finds that it is more likely than not that the 31 customers who signed declarations involving repairs performed after October 2005 assigned their claims to *someone*, the Court cannot find that it is more likely than not that the 31 customers assigned their claims to *Boulay*.

In sum, the Court holds that Boulay has the right to compel Farmers to arbitrate only 13 of the 212 disputed claims in this group — the 12 claims discussed above plus a claim assigned by Jennifer Huber.[8]

---

[8]Farmers challenged Huber's claim because Boulay allegedly failed to produce a work order bearing her signature. Grande Decl. Ex. 1 at 3 [Docket No. 104-1]. But Huber's signed

(continued...)

### B. Findings of Fact

Consistent with the foregoing discussion, the Court makes the following findings of fact:

2.01.    Boulay's routine practice was to generate two documents for every auto-glass repair: (a) an invoice, which did not contain an assignment provision and which the customer did not sign; and (b) a work order, which a customer was typically asked to sign, and which typically included both a provision that authorized the insurer to pay Boulay and a provision that assigned the customer's claim against the insurer to either Boulay or NCA.  Pl. Reply Mem. at 3.

2.02.    Some of Boulay's customers signed work orders either before or immediately after their auto glass was repaired.  Lloyd Second Decl. Ex. 3 at 5.  But a significant number of Boulay's customers did not.  Boulay Third Decl. at ¶ 7.  If a customer was not available to sign a work order either before or just after the repair, Boulay provided its work order for the customer to sign and return by mail.  Lloyd Second Decl. Ex. 3 at 4.  Boulay did not get a signed work order from every customer.  *Id.* at 4-5.  Boulay has alleged that it "work[s] very hard" to collect all the work orders and has been "pretty effective" at collecting them.  *Id.*  But Boulay has not provided evidence as to how many customers never return a signed work order.

2.03.    Boulay typically submitted invoices — not work orders — to Safelite, Farmers's third-party administrator.  Boulay Declaration at ¶ 4.  Boulay has not established that its routine practice was to submit work orders to Safelite.

---

[8](...continued)
work order, which named Boulay as the assignee of her claim, was submitted to the Court with Farmers's summary judgment briefs.  Tumblin Decl. Ex. K [Docket No. 65-2 at 5]; Tumblin Second Decl. Ex. FF [Docket No. 79-3 at 4].

2.04.    When Safelite received an invoice from Boulay, its routine practice was to audit the invoice to verify that the customer had authorized the auto-glass repair.  Tumblin Second Decl. at ¶ 5. Safelite's routine practice was to withhold payment of an invoice until that verification was completed.  *Id.*

2.05.    Safelite relied on several types of evidence in verifying that a customer had authorized a repair.  For invoices submitted on paper, Safelite accepted Boulay's assurance that it had a customer's "Signature on File."  *Id.* ("The 'Signature on File' notation is a substitute for an actual signature that Safelite accepts when auditing an invoice from a glass shop.").  At one time, Safelite also accepted "loss accord" forms filled out by insurance agents in lieu of an actual signature from the customer.  *Id.* at ¶ 7.

2.06.    Safelite's verification procedures may or may not have violated Farmers's payment policies.  Farmers required proof that the customer authorized the auto-glass repair.  Keller Second Decl. at ¶ 4 [Docket No. 80].  Farmers also required the customer (or the spouse of the customer) to have signed a work order, confirming that the repair was performed and authorizing Farmers to issue payment directly to the auto-glass shop.  Abrahamson Decl. Ex. 3 at 3-4.  It is unclear, however, whether Farmers ever communicated to Safelite that it should not pay a claim until it had in hand a copy of the work order signed by the customer.  Safelite may have reasonably understood that it could accept the representation of the auto-glass shop that a signed work order was on file.  In any event, Farmers never required proof that the customer assigned his or her claim to the glass-repair shop before authorizing payment of an invoice.  Keller Second Decl. at ¶ 4.

2.07.    Many of the invoices that Boulay submitted to Safelite contained the "Signature on File" notation.  *See, e.g.*, Tumblin Second Decl. Ex. FF [Docket No. 79-1 at 2-9].  Boulay has not provided evidence about who prepared these invoices or what that person did to confirm that Boulay had a copy of a signed work order in its files.

2.08.    Some of Boulay's invoices were submitted to Safelite with "loss accord" forms. *See, e.g.*, Tumblin Second Decl. Ex. FF [Docket No. 79-1 at 12-15, 17-18].  These loss-accord forms did not include a signature from a customer or a representation that the customer's signature was on file.

2.09.    Boulay received partial payment from Safelite (acting on behalf of Farmers) on most of the 212 disputed claims.  Pl. Mem. at 5.

2.10.    Boulay has submitted sworn declarations from 64 of its customers in which the customers aver that: (a) Boulay repaired their auto glass; (b) they remember signing papers to facilitate direct payment to Boulay; and (c) they intended to assign their insurance claims to Boulay.  Lloyd Second Decl. Exs. 5-7; Lloyd Third Decl. Exs. 8-9.  As a general matter, the Court finds no reason to doubt the assertions of these customers.

2.11.    Of the 64 customers who signed declarations, 46 relate to the group of 212 claims that Farmers has disputed because Boulay is unable to produce signed work orders.  But 3 of these 46 customers are also related to the group of 83 claims that Farmers has disputed because the claims were assigned to NCA instead of Boulay.[9]  *Compare* Lloyd Second Decl. Ex. 5 at 1, *and*

---

[9]Farmers has challenged Theresa Anderson's invoice dated 01/30/06 for lack of a signed work order and her invoice dated 09/30/05 as an assignment to NCA.  Farmers has challenged Lynn Anderson's invoice dated 05/31/04 for lack of a signed work order and her invoice dated 07/31/06 as an assignment to NCA.  Farmers has challenged Wade Deshaw's invoice dated

(continued...)

Ex. 6 at 3, 7, *with* Lloyd Second Decl. Ex. 7 at 1-2, 7.  As to the remaining 43 customers, the Court finds that it is more likely than not that they signed a work order that assigned their claims against Farmers to either Boulay or NCA.

2.12.    Boulay did not contract with NCA until April 2005 and therefore the work orders that Boulay used in 2004 would have named Boulay as the assignee.  Thus, it is more likely than not that each of the 12 customers who signed declarations regarding repairs performed in 2004 assigned their claims to Boulay.

2.13.    Following the termination of its relationship with NCA in roughly October 2005, Boulay continued to ask at least some customers to sign work orders that named NCA as the assignee of the customer's claim against his or her insurer.  Boulay has not established by a preponderance of the evidence that the other 31 customers — that is, those customers who signed declarations regarding repairs performed after April 2005 — assigned their claims to Boulay instead of NCA.

2.14.    Of the total of 295 claims that are disputed, Boulay has established by a preponderance of the evidence that it obtained a valid assignment only with respect to the following 13 claims:

- Jennifer Huber (invoice date 7/19/2007);
- Theresa Sloggy (invoice date 2/25/2004);
- Barbara Stark (invoice date 3/16/2004);
- Larrie Villano (invoice date 4/9/2004);
- Charlotte Winger (invoice date 4/9/2004);
- Al Hoff (invoice date 4/9/2004);
- Steve Terry (invoice date 4/20/2004);

---

[9](...continued)
05/17/05 for lack of a signed work order and his invoice dated 11/30/05 as an assignment to NCA.  *See* Grande Decl. Ex. 1 at 4, 6-8, 10.

- Thomas Bregmann (invoice date 5/28/2004);
- Larrie Pittelko (invoice date 5/28/2004);
- Dyanne Ross-Hanson (invoice date 6/18/2004);
- Linda Nelson (invoice date: 7/30/2004);
- Ann Hogan (invoice date: 8/5/2004); and
- Jeff Anderson (invoice date: 12/30/2004).

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS

HEREBY ORDERED THAT Boulay's motion for summary judgment [Docket No. 68] to compel

Farmers to arbitrate certain claims challenged by Farmers in a single, consolidated arbitration is

GRANTED IN PART, and Farmers's motion for summary judgment [Docket No. 62] to dismiss

certain claims that it challenged is DENIED IN PART, as follows:

1.  Boulay's motion is GRANTED, and Farmers's motion is DENIED, as to the following

claims (as well as to all claims whose assignment to Boulay has not been disputed by Farmers):

- Roger Maltzen (invoice date 7/23/2009);
- Jean Meyer (invoice date 3/18/2005);
- Linda Bailie (invoice date 4/09/2004);
- Jennifer Huber (invoice date 7/19/2007);
- Theresa Sloggy (invoice date 2/25/2004);
- Barbara Stark (invoice date 3/16/2004);
- Larrie Villano (invoice date 4/9/2004);
- Charlotte Winger (invoice date 4/9/2004);
- Al Hoff (invoice date 4/9/2004);
- Steve Terry (invoice date 4/20/2004);
- Thomas Bregmann (invoice date 5/28/2004);
- Larrie Pittelko (invoice date 5/28/2004);
- Dyanne Ross-Hanson (invoice date 6/18/2004);
- Linda Nelson (invoice date: 7/30/2004);
- Ann Hogan (invoice date: 8/5/2004); and
- Jeff Anderson (invoice date: 12/30/2004).

The parties are ORDERED to arbitrate their dispute over these invoices in a single,

consolidated arbitration conducted pursuant to the Minnesota No-Fault Act.

2.  Boulay's motion is DENIED, and Farmers's motion is GRANTED, in all other respects.


LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: September 23, 2011                        s/Patrick J. Schiltz
                                                 Patrick J. Schiltz
                                                 United States District Judge